**Opinion issued June 30, 2015**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-14-00096-CR

_____

**JOHNATHAN ROSS NICKERSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 177th District Court**
**Harris County, Texas**
**Trial Court Case No. 1238640**

---

## O P I N I O N

Johnathan Nickerson was indicted by a grand jury for the offense of capital murder. *See* TEX. PENAL CODE ANN. §19.03(a)(2) (West 2014). A jury found Nickerson guilty, and the trial court assessed punishment at life imprisonment

without the possibility of parole.  On appeal, Nickerson contends the trial court erred in (1) denying his motion to suppress the statement he made to the police; (2) entering a judgment of conviction despite insufficient evidence to support the jury's finding of guilt; (3) admitting evidence about the two other decedents who were killed at the same time as the complainant named in the charge; admitting hearsay testimony regarding his coconspirator's statements; (5) denying him effective confrontation and cross-examination of a witness; and (6) denying his motion for mistrial.  Finding no error, we affirm.

## Background

On a Saturday evening in late October 2009, the Houston Police Department (HPD) dispatched officers to a park in southeast Houston to investigate a parked white Dodge Ram flatbed truck with a very loud sound coming from it.  The responding officers approached the truck and found two men in, both with gunshot wounds in the head and slumped inside the front of the truck cab with blood pooling beneath them, and a teenaged male with a gunshot wound in the chest crumpled motionless on the ground beside an open passenger door.  A blue cell phone sat on the ground near the teenager's body.  The officers determined that the loud sound came from the truck's engine, which was running at full throttle because the accelerator pedal was depressed to the floor under the deceased driver's foot.

A crime scene investigator collected evidence from the scene, including five nine-millimeter cartridge casings, three of which were determined to have been fired from the same weapon. The deceased driver was found to have a pistol on the seat underneath his right leg, but that gun was of a different caliber. By Sunday, the homicide investigators had received information that enabled them to identify the three decedents as Miguel Morales, Narciso Briagas, and Roman Barragan, Jr., but had no investigative leads.

On Monday morning, the weekend homicide investigators handed the case off to HPD Officer E. Cisneros. Barragan's father provided HPD with his cell phone account records, which revealed that Nickerson's telephone number was the last number that was in communication with Barragan's cell phone. Cisneros searched the number on an Internet database and discovered it was linked to Nickerson.

Cisneros called the number; Nickerson answered. When Cisneros told Nickerson that he was investigating Barragan's murder, Nickerson seemed surprised. Nickerson agreed to meet with Officer Cisneros. That evening, Cisneros, accompanied by Sergeant B. Roberts, another HPD investigator, drove to Nickerson's apartment complex in an unmarked car and met Nickerson in front of the leasing office. Cisneros told Nickerson about his telephone number's

appearance as the last number on Barragan's cell phone records, and Nickerson agreed to accompany the officers to the police station.

During the ride from Nickerson's home to the police station, Nickerson told Cisneros that he had been present inside the truck when the shooting took place. At the police station, Nickerson checked in as a visitor. Cisneros escorted Nickerson to an interview room in the homicide division on the sixth floor. Roberts monitored the interview from another room through a hidden video camera.

Cisneros recounted that he told Nickerson, "In a moment, we're going to take a recorded statement. You understand this is on a voluntary basis and that you're not under arrest, and you're free to go any time. Do you understand that?" Nickerson responded, "Yes." The recorded statement then began.

At the outset, Cisneros offered Nickerson a bottle of water, which he accepted. Cisneros again explained to Nickerson that he was going to take Nickerson's statement and asked him again if he came voluntarily to the station. Nickerson agreed that he did.

In his recorded statement to Cisneros, Nickerson admitted that he had known Barragan for about two years as a fellow classmate in high school. He did not know the other decedents. The morning of the shooting, Barragan had called Nickerson to let him know that his family had acquired several bales of marijuana;

4

he asked Nickerson whether he wanted to buy some. Nickerson said he did not know anyone who wanted to buy such a large amount, but that he was interested in a $20 bag. He made plans to meet Barragan later at the park to make the transaction.

Meanwhile, Nickerson's cousin Robert Walton was about to go on an errand to pick up another relative, Glen Brown, who was ending his work shift at a grocery store in Pearland. While driving his mother's silver Lexus, Walton saw another cousin, David McFarland walking down the street. McFarland flagged Walton down and got into the car. Then, Walton received the call from Nickerson, who also asked Walton for a ride.

When Nickerson got into the car, McFarland asked him if he knew where he could get any marijuana. Nickerson told McFarland about the large amount of marijuana Barragan said was available, and McFarland told Nickerson he wanted five pounds. According to Walton, McFarland began talking to Nickerson about "how are we going to get it, we need to figure something out." McFarland said he had to have a gun with him, "we got to be strapped." Nickerson then called Barragan and asked him to bring five pounds of marijuana to the park.

In the meantime, McFarland located a friend who agreed to loan him an automatic handgun. He got the gun and met Nickerson at a friend's house. That evening, Barragan called Nickerson to let him know that he was on his way to the

park. Nickerson and McFarland began walking to the park. On the way to the park, McFarland racked the gun. He told Nickerson he was "going to draw down on them . . . I'm trying to make some money." Nickerson and McFarland approached the truck; Barragan directed Nickerson to "go around" and slide into the backseat next to him. While Nickerson was getting into the truck beside Barragan, McFarland began shooting.

Nickerson got out of the truck and ran away. Nickerson called Walton and asked if he could pick him up at a location within walking distance of the park and take him home. When Walton arrived, he noticed Nickerson was breathing hard. Walton, still driving his mother's Lexus, stopped at his home, where he and Nickerson greeted Walton's mother. Walton and Nickerson then left to attend a party at an aunt's home nearby. During the half-hour or so they were there, McFarland appeared in the street in front of the house, holding a bag of marijuana. Nickerson went to speak with him outside. He asked McFarland for some marijuana, but McFarland did not let Nickerson have any. McFarland said, "I'm going to sell this. I'm going to make some money for it."

Walton and Nickerson left the party, and Walton drove Nickerson to his apartment. Nickerson went into his room and changed his clothes. He came out of the room with the clothes he had been wearing in a grocery bag and holding his

shoes in the other hand. They got back into the Lexus. As Walton drove down the street, Nickerson threw his shoes out the window.

According to Cisneros, Nickerson went from being a witness to a suspect in the robbery and murder about an hour into his recorded interview, when Nickerson admitted to Cisneros that he knew that McFarland planned to "draw down" the gun on Barragan to rob him of the marijuana rather than buy it. According to Nickerson, before that point, he believed that the meeting was going to be a legitimate drug exchange and that he would get some "free weed" out of it. When McFarland racked the gun at the park, though, Nickerson realized the plan was to rob Barragan, and there was no time to negotiate his share of the marijuana before the robbery took place.

Nickerson admitted that he knew McFarland had a loaded gun with him for their meeting with Barragan. He identified McFarland as the shooter of the three decedents.

## Discussion

### I.   Denial of Motion to Suppress

Nickerson contends that the trial court erred in denying his motion to suppress because Officer Cisneros continued to question him without providing the necessary warnings in violation of his rights under *Miranda v. Arizona*, 384 U.S.

7

436, 86 S. Ct. 1602 (1966), and article 38.22 of the Texas Code of Criminal Procedure.

## A. Standard of review

We review a ruling on a motion to suppress for an abuse of discretion. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013); *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). We review a trial court's factual findings for abuse of discretion and its application of the law to the facts de novo. *Neal v. State*, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008). We defer to a trial court's determination of historical facts, especially those based on an evaluation of a witness's credibility or demeanor. *Turrubiate*, 399 S.W.3d at 150; *Gonzales v. State*, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012). We apply the same deference to review mixed questions of law and fact. *Turrubiate*, 399 S.W.3d at 150. When, as in this case, the trial court makes findings of fact and conclusions of law, we will uphold the trial court's ruling if it is "reasonably supported by the record and is correct on any theory of law applicable to the case." *Id.* (citing *Valtierra v. State*, 310 S.W.3d 442, 447–48 (Tex. Crim. App. 2010)). *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

## B. Custodial interrogation

The Fourth Amendment of the United States Constitution and Article I, Section 9 of the Texas Constitution protect against unreasonable searches and seizures by government officials. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007); *Atkins v. State*, 882 S.W.2d 910, 912 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). In *Miranda*, the United States Supreme Court determined that an accused, held in custody, must be given required warnings before questioning. 384 U.S. at 444–45, 86 S. Ct. at 1612; *see Jones v. State*, 119 S.W.3d 766, 772 (Tex. Crim. App. 2003). Law enforcement's failure to comply with *Miranda*'s requirements results in forfeiture of the use of any statement obtained during that questioning by the prosecution during its case-in-chief. 384 U.S. at 444, 475–76, 86 S. Ct. at 1612, 1628–29. Similarly, the Texas Code of Criminal Procedure provides that a statement is admissible against a defendant in a criminal proceeding if, among other things, the defendant was warned as the statute requires before the statement was made, and the defendant "knowingly, intelligently, and voluntarily" waived the rights set out in the warnings. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.22, §§ 2(a), 3(a) (West 2005).

As with the *Miranda* warnings, the article 38.22 warnings are required only for custodial interrogations. *Id.*; *Woods v. State*, 152 S.W.3d 105, 116 (Tex. Crim.

App. 2004); TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a). Our understanding of "custody" for purposes of article 38.22 is consistent with the meaning of "custody" for purposes of *Miranda*. *Herrera*, 241 S.W.3d at 526. "Custody," for purposes of *Miranda* and article 38.22, includes the following: (1) the suspect is physically deprived of his freedom of action in a significant way; (2) a law enforcement officer tells the suspect he is not free to leave; (3) law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) probable cause exists to arrest the suspect, and law enforcement officers do not tell the suspect he is free to leave. *Gardner v. State*, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009) (citing *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996)). The fourth situation exists only when the officer communicates the knowledge of probable cause to the suspect or the suspect concedes the existence of probable cause to the officer. *Dowthitt*, 931 S.W.3d at 255. Such a concession, however, does not automatically establish a custodial interrogation; rather, it is a factor to consider, together with other circumstances, to determine whether a reasonable person would believe that he is under restraint to a degree associated with an arrest. *Id.*; *Ervin v. State*, 333 S.W.3d 187, 211 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd).

Additional circumstances to consider for determining whether an interrogation is custodial include whether the suspect arrived at the interrogation

10

place voluntarily, the length of the interrogation, any requests by the suspect to see relatives or friends, and the degree of control exercised over the suspect. *Ervin*, 333 S.W.3d at 205; *Xu v. State*, 100 S.W.3d 408, 413 (Tex. App.—San Antonio 2002, pet. ref'd). An interrogation that begins as noncustodial can evolve; police conduct during the encounter may escalate the interview to a custodial interrogation. *Dowthitt*, 931 S.W.2d at 255.

Nickerson contends that the fourth custodial situation applies to his circumstances—that Cisneros continued the interrogation without warning Nickerson even after probable cause to arrest him for capital murder arose. It is undisputed that Cisneros did not inform Nickerson of his *Miranda* rights or provide him with article 38.22 warnings. Nickerson argues that probable cause to arrest him for capital murder existed because (1) Cisneros knew that Barragan had left his house on the day of the murder to sell marijuana; (2) in the car on the way to the police station, Nickerson told Cisneros that he had been present at the time of the shooting; and (3) early in the interview, Nickerson disclosed that he had been sitting inside the vehicle next to Barragan when the shooting occurred. Nickerson also notes that, during the interview, Cisneros accused Nickerson of shooting Barragan and of working with McFarland to commit the robbery.

At the suppression hearing, Cisneros testified that his accusations were not based on any information that he had about Nickerson's involvement in planning

11

the robbery or committing the murder; they were instead part of the interrogation tactics he used to elicit information from Nickerson.

Nickerson's testimony concerning whether he felt coerced to remain during the questioning was equivocal. At the beginning of the recorded interview, Cisneros gave Nickerson a bottle of water and asked him if he voluntarily accompanied the officers to the station to give a statement. Nickerson confirmed that he had voluntarily agreed to the interview. He also confirmed his understanding that he was not under arrest and was free to stop the interview and leave at any time. Nickerson admitted that he voluntarily continued to talk to Cisneros and continued to provide information to Cisneros because he wanted Cisneros to understand his version of the events. Nickerson did not indicate to Cisneros that he wanted an attorney before, or at any time during, the interview.

The trial court observed the videotaped interview. It found that Nickerson was not in custody and subject to custodial interrogation laws until Nickerson admitted to his involvement in the robbery and Cisneros stepped out of the room, approximately an hour into the interrogation. The trial court thus allowed the first 66 minutes of Nickerson's recorded statement, and suppressed the remainder.

In its ruling on the motion to suppress, the trial court stated:

Nickerson voluntarily, freely went with the officers to the police station, was free to go, and voluntarily gave his statement up until that point [when Cisneros exited the room]. From that point forward,

12

anything used in the presence of the jury, all that portion after the officer—including the search for clothes or shoes or any of that that came as a result, all of that is now suppressed.

We hold that the evidence reasonably supports the trial court's determination that Nickerson was not in custody during the first 66 minutes of the videotaped statement. *See Ervin*, 333 S.W.3d at 211 (concluding that defendant was not in custody when she went to police station voluntarily, voluntarily gave statements to police, was told she could leave, and remained unhandcuffed throughout statements); *see also Gardner v. State*, 433 S.W.3d 93, 99 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (holding that defendant was not in custody when he willingly accompanied the police to patrol car for both interviews, was never handcuffed, and was told that he could terminate interviews and leave car at any time). Before the recorded interview, Cisneros told Nickerson that he was not under arrest and that he was free to leave. During the interview, he confirmed that Nickerson voluntarily had agreed to give a statement, had been treated fairly and had not been threatened. Although Cisneros knew that Nickerson was at the scene of the murder before the interrogation occurred, mere presence is insufficient to charge a suspect with capital murder. *Solomon v. State*, 49 S.W.3d 356, 361–62 (Tex. Crim. App. 2001); *King v. State*, 29 S.W.3d 556, 564–65 (Tex. Crim. App. 2000). Before the interrogation, Cisneros testified, he had no evidence that Nickerson was the shooter, or that Nickerson had planned the robbery with

13

McFarland and was a party to it. Based on that testimony, the trial court reasonably could have concluded that Nickerson's witness interrogation was not custodial in nature until after Nickerson admitted his involvement in the robbery. Accordingly, we hold that the trial court did not abuse its discretion in refusing to suppress the entirety of Nickerson's recorded statement.

## II. Evidentiary Sufficiency

### A. Standard of review

Nickerson next challenges the sufficiency of the evidence to support his conviction for capital murder. In reviewing the sufficiency of the evidence to support a conviction, we consider all of the record evidence in a light most favorable to the verdict, and determine whether no rational fact-finder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *In re Winship*, 397 U.S. 358, 361, 90 S. Ct. 1068, 1071 (1970); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We consider the combined and cumulative force of all the evidence, to determine whether the necessary inferences have a reasonable basis in the evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (citing *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007)). Circumstantial evidence is as probative as direct evidence in

14

establishing the guilt of an actor, and circumstantial evidence can be sufficient to establish guilt. *Id.* We presume that the fact-finder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

## B.     Conviction as a party to capital murder.

The State conceded that McFarland shot Barragan and prosecuted Nickerson for capital murder as a criminally responsible party to the murder, based on evidence that Nickerson conspired and acted with McFarland to rob Barragan using a deadly weapon, and that it was reasonably foreseeable that McFarland would shoot Barragan in the process.

A person may be guilty of capital murder either as a principal actor or as a party to the offense. A person is guilty of capital murder as a principal actor if he intentionally causes the death of another in the course of committing or attempting to commit robbery. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (stating that a person commits murder if he "intentionally or knowingly causes the death of an individual"); TEX. PENAL CODE ANN. § 19.03(a)(2) (stating that a person commits capital murder if "the person intentionally commits…murder [as described in section 19.02(b)(1) of the Penal Code] in the course of committing or attempting to commit . . robbery"); *Love v. State*, 199 S.W.3d 447, 452 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). A person is a criminally responsible third party to

capital murder committed during the course of a robbery if the person is guilty of robbery as a conspirator and, "though having no intent to commit it, if the [murder] was committed in furtherance of the [robbery] and was one that should have been anticipated as a result of the carrying out of the conspiracy. *See* TEX. PENAL CODE ANN. § 7.02(b) (West 2003); *see also* TEX. PENAL CODE ANN. § 7.01(a) ("A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.").

Accordingly, to show that Nickerson was guilty of capital murder, the State was required to adduce legally sufficient evidence for a rational factfinder to conclude beyond a reasonable doubt both that Barragan was murdered during the course of a conspiracy to commit aggravated robbery, and though Nickerson had no intent to commit Barragan's murder, he nonetheless was a party to the robbery with a deadly weapon and should have anticipated Barragan's murder was a foreseeable result from carrying out the robbery, here by using a deadly weapon. *See Love*, 199 S.W.3d at 452; TEX. PENAL CODE ANN. § 7.02(b). To determine whether a defendant is culpable as a party, a court may look to events which occurred before, during, and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to

commit the underlying felony in a manner in which demonstrates knowledge of the risk that murder was a reasonably foreseeable result. *Love*, 199 S.W.3d at 452.

*Analysis*

Nickerson claims that the evidence in support of his conviction is legally insufficient because McFarland acted alone in the robbery; Nickerson merely arranged the transaction for him. Nickerson points to evidence that he got into the truck beside Barragan during the robbery and then ran from the scene without taking any marijuana or other property. This testimony, he claims, shows that he lacked any intent to commit robbery as a party to McFarland's crime, negating his guilt for the underlying felony to capital murder.

Walton, however, testified that he overheard Nickerson tell McFarland that Barragan had offered to sell Nickerson a large quantity of marijuana, to which McFarland responded that he "could make some money off of it." Nickerson and McFarland then discussed how they were going to take the marijuana from Barragan, and that McFarland told Nickerson, "we got to be strapped"—meaning that they needed to have a gun with them. After McFarland obtained the gun, Nickerson called Barragan to arrange a meeting. Nickerson admitted that he wanted to act as a middleman to get some "free weed." He ultimately admitted that he knew when McFarland racked the gun as they approached the truck that the

17

plan was to rob Barragan. Nickerson planned to share in the "free weed" even though there was not time to negotiate the amount of his share.

There was also evidence that Nickerson should have known that the murders were a foreseeable result of the robbery. Nickerson knew that McFarland had acquired an automatic handgun, that the gun was loaded and racked as the two neared the park for the meeting Barragan. He had purchased marijuana from Barragan before, and stated that typically both participants carry a gun with them. He knew that McFarland intended to "draw down" the gun to procure the marijuana from Barragan. Nickerson told Cisneros that he knew that McFarland's use of the gun indicated that McFarland did not intend to pay for the marijuana. Nickerson nevertheless accompanied McFarland to the truck to execute the robbery and acted to contain Barragan by getting inside the truck. From this testimony, a rational jury could conclude that Nickerson was criminally liable as a party to the aggravated robbery and that the murder was committed in furtherance of the robbery and should have been anticipated as a result of carrying it out. *See* TEX. PENAL CODE ANN. § 7.02(a)(2) ("A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense."); TEX. PENAL CODE ANN. § 7.02(b) (felony committed in the course of committing another felony).

18

The fact that Nickerson ran away from the truck after the shootings does not negate the evidence of his involvement in executing a plan with McFarland to rob Barragan of the marijuana or the jury's determination that he should have reasonably anticipated that McFarland would use the gun to kill Barragan. We hold that the evidence is legally sufficient to support Nickerson's conviction.

## III.    Error in the Admission of Evidence

Nickerson complains that the trial court erred in admitting evidence of the deaths of Briagas and Morales, the two individuals who arrived in the truck with Barragan, and in admitting under Texas Rule of Evidence 801(e)(2)(E) Walton's testimony about statements McFarland made to Nickerson during their car ride.

### A.    Standard of review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). A trial court abuses its discretion only if its decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008). A trial court does not abuse its discretion if some evidence supports its decision. *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002). We uphold a trial court's evidentiary ruling if it was correct on any theory of law applicable to the case. *De la Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

## B. Evidence of the other decedents

Nickerson contends that the trial court erred in admitting evidence of Briagas and Morales's deaths because the State failed to provide notice of its intent to introduce it as extraneous-offense evidence pursuant to Texas Rule of Evidence 404(b) and because the evidence was not relevant to the charge that Nickerson was responsible for Barragan's murder.

Same-transaction contextual evidence, however, is admissible as an exception under Rule 404(b) when it is necessary to the jury's understanding of the charged offense. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011); *Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993). It "results when an extraneous matter is so intertwined with the State's proof of the charged crime that avoiding reference to it would make the State's case incomplete or difficult to understand." *Prible v. State*, 175 S.W.3d 724, 732 (Tex. Crim. App. 2005); *Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000) (quoting *Moreno v. State*, 721 S.W.2d 295, 301 (Tex. Crim. App. 1986)). The purpose of admitting extraneous evidence as same-transaction contextual evidence is to put the charged offense in context. *Mayes v. State*, 816 S.W.2d 79, 86–87 (Tex. Crim. App. 1991); *Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993); *Jones v. State*, 962 S.W.2d 158, 166 (Tex. App.—Fort Worth 1998, no pet.). "[E]vents do not occur in a vacuum, and the jury has a right to hear what occurred immediately" before and

after the commission of the charged act so that it may properly evaluate the evidence. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000).

McFarland shot Briagas and Morales within seconds of shooting Barragan. Their bodies were part of the crime scene. Explaining their presence was necessary to the jury's understanding of how Briagas's truck came to be at the scene and the location of Barragan's body. During his interview, Nickerson told Cisneros that as he slid into the back seat by Barragan, he heard McFarland fire the shots that killed Briagas and Morales and McFarland shot Barragan as Nickerson was running away. The crime scene photographs demonstrate that Briagas and Morales's deaths were an integral part of the crime; all three were involved in delivering the marijuana, and thus connected to form an indivisible criminal transaction. *See Prible v. State*, 175 S.W.3d 724, 731–32 (Tex. Crim. App. 2005); *Wesbrook*, 29 S.W.3d at 115. Evidence that McFarland shot Briagas and Morales before shooting Barragan also was relevant to whether McFarland intentionally caused Barragan's death, a necessary element of proof in showing that Nickerson was a party to capital murder. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(2). The jury's understanding of the crime would have been obscured without evidence of the three homicides. *See Taylor v. State*, 263 S.W.3d 304, 314 (Tex. App.—Houston [1st Dist.] 2007), *aff'd*, 268 S.W.3d 571 (Tex. Crim. App. 2008). We hold that the trial court acted within its discretion in admitting the

21

evidence of Briagas and Morales's deaths as same-transaction contextual evidence not subject to the 404(b) notice requirement.

### C.     Evidence of coconspirator's statements

The trial court admitted, through Walton's testimony, statements made by McFarland during his conversations with Nickerson in the car. The trial court admitted these statements as coconspirator statements under Texas Rule of Evidence 801(e)(2)(E). That provision of the rule declares that a statement is not hearsay if it "is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." TEX. R. EVID. 801(e)(2)(E).

The coconspirator rule has four basic requirements: (1) a conspiracy must exist, (2) the declarant and the party against whom the statement is being offered must both be participants in the conspiracy; (3) the statement must be made during the course of the conspiracy, and (4) the statement must be made in furtherance of the conspiracy, not merely "related to" the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S. Ct. 2775, 2778 (1987); *Guidry v. State*, 9 S.W.3d 133, 148 (Tex. Crim. App. 1999). A statement furthers a conspiracy if it advances the cause of the conspiracy or serves to facilitate it. *Guidry*, 9 S.W.3d at 148; *see Byrd v. State*, 187 S.W.3d 436, 443 (Tex. Crim. App. 2005).

Walton testified that during the car ride,

- Nickerson told McFarland that Barragan had several bales of marijuana for sale, and McFarland responded that he could make money from such a large amount.

- Nickerson and McFarland discussed that they needed to figure out how they were going to get it, but never mentioned how they would pay for the marijuana or what it cost.

- McFarland discussed with Nickerson that he needed to be armed for the transaction.

Nickerson objected to this testimony as not having occurred "during the course" of a conspiracy because the statements did not demonstrate that a conspiracy existed.

The evidence shows otherwise. McFarland and Nickerson's conversation about Barragan's large quantity of marijuana spurred Nickerson to call Barragan and arrange to meet him for a transaction later that evening. McFarland procured a handgun later that same afternoon and, with Nickerson's knowledge, took the loaded gun with him when he went with Nickerson to meet Barragan. Nickerson admitted during his interview with Cisneros that he decided to play middleman between McFarland and Barragan with the expectation that he would get some free marijuana for setting up the transaction. The evidence of Nickerson and McFarland's behavior tending to prove a conspiracy corresponds directly to Walton's testimony about the statements they made in the car, which supports the conclusion that the statements were made during the course of and in furtherance

of the conspiracy. *See Guidry*, 9 S.W.3d at 148. We therefore hold that the trial court did not abuse its discretion in admitting Walton's testimony about the communications pursuant to Rule 801(e)(2)(E).

## IV. Violation of Confrontation Clause Rights

Nickerson next complains that the trial court violated his rights under the Confrontation Clause of the Sixth Amendment of the United States Constitution by refusing to allow him to cross-examine Walton about Nickerson's peaceful character. We review a trial court's decision to limit a defendant's cross-examination of a witness for an abuse of discretion. *Miller v. State*, 36 S.W.3d 503, 507 (Tex. Crim. App. 2001); *Martinez v. State*, 212 S.W.3d 411, 425 (Tex. App.—Austin 2007, pet. ref'd).

Before the jury, Nickerson's counsel elicited the following testimony from Walton:

| | |
|---|---|
| [Defense Counsel:] | You said you grew up with [Nickerson]? |
| [Walton:] | Yes, sir. |
| [Defense Counsel:] | What kind of stuff did y'all do when y'all hung out? |
| [Walton:] | We did play sports, talked to girls, normal things kids do. |
| [Defense Counsel:] | Did y'all rob people? |
| [Walton:] | No, sir. |
| [Defense Counsel:] | Did you jack people? |
| [Walton:] | No, sir. |

24

At that point, the trial court stopped the cross-examination and ordered the jury to be removed.

In an offer of proof, Nickerson adduced evidence that Walton had known Nickerson and McFarland as his cousins for many years, and that neither of them had a history of robbery or violence, except for one occasion when McFarland was involved in a fight. The other questions in the offer of proof were similar to Walton's earlier testimony that Nickerson and McFarland had never robbed or "jacked people with a gun" before. Nickerson contends that this cross-examination was relevant to whether he should have foreseen that McFarland would use a gun to shoot Barragan and the others.

To the extent that counsel sought to admit testimony that Nickerson had not robbed or "jacked" anyone before, this testimony is cumulative of Walton's testimony to the jury before the trial court stopped the proceedings. With respect to Nickerson's reputation for violence, after the offer of proof, the trial court ordered that, "You can ask [Walton] if he knows if [Nickerson] has ever been violent, if he's ever seen him be violent, but other than that, all your other questions are inadmissible here or anywhere else." Thus, the trial court permitted the defense to cross-examine the witness about Nickerson's general reputation for peacefulness and lack of any specific instances of violence. *See* TEX. R. EVID. 404(a) (allowing evidence of pertinent character trait of accused when offered by

25

accused or by prosecution to rebut such evidence); TEX. R. EVID. 405 (permitting witness familiar with reputation of accused to testify to accused's reputation or proffer opinion of accused's character on direct examination, but only to specific instances of conduct on cross-examination once such opinion or reputation evidence is introduced). Nickerson's complaint that the trial court improperly limited cross-examination into Nickerson's character is without merit.

With respect to Walton's testimony about McFarland, Nickerson argues that cross-examination testimony that McFarland did not have a reputation for violence and had not engaged in violent conduct was necessary "to clear up any false impressions" that Walton had introduced by his testimony indicating that a conspiracy to rob Barragan existed or that a gun would be used. On appeal, Nickerson challenges the trial court's ruling as an impermissible infringement of Nickerson's Sixth Amendment right to confront witnesses against him. In the trial court, however, Nickerson argued that the evidence was relevant. He did not raise a Confrontation Clause objection.

To complain of a Confrontation Clause objection on appeal, a party must object in the trial court to the ruling disallowing that testimony. *Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000). A relevance objection is insufficient to preserve a Confrontation Clause challenge. *See Reyna v. State*, 168 S.W.3d 173, 179 & n.29 (Tex. Crim. App. 2005) (holding that hearsay argument for admission

26

of evidence did not preserve Confrontation Clause challenge on appeal; argument could have referred either to Rules of Evidence or Confrontation Clause, but failed to identify Confrontation Clause as basis and thus did not put trial court on notice of issue) (citing *Paredes v. State*, 129 S.W.3d 530, 535 (Tex. Crim. App. 2004)). Because the objection in the trial court does not comport with Nickerson's complaint on appeal, we hold that his Confrontation Clause challenge is waived.

## V.     Denial of Motion for Mistrial

In his final issue, Nickerson contends that the trial court erred in refusing to grant his request for a mistrial based on the State's closing argument. A mistrial is a drastic remedy, required only when an "error is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000) (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)). A party is entitled to a mistrial "only if a timely objection would not have prevented, and an instruction to disregard would not have cured, the harm flowing from the error." *Unkart v. State*, 400 S.W.3d 94, 99 (Tex. Crim. App. 2013).

Proper jury argument is generally limited to (1) a summation of the evidence presented at trial, (2) reasonable deductions and inferences drawn from that evidence, (3) responses to opposing counsel's argument, and (4) appropriate pleas for law enforcement. *Wesbrook*, 29 S.W.3d at 115; *Carmen v. State*, 358 S.W.3d

285, 300 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). The trial court has broad discretion in controlling the scope of closing argument. *Lemos v. State*, 130 S.W.3d 888, 892 (Tex. App.—El Paso 2004, no pet.); *see Herring v. New York*, 422 U.S. 853, 862–63, 95 S. Ct. 2550, 2555–56 (1975).

Improper-argument error is non-constitutional error. *Brown v. State*, 270 S.W.3d 564, 572 (Tex. Crim. App. 2008). Thus, even if we conclude that the trial court erred in denying a request for a mistrial, we disregard the error unless it affects the defendant's substantial rights. *Id.* Under the substantial-rights standard in this context, reversal is required only when, in light of the record as a whole, the argument is extreme, manifestly improper, violative of a mandatory statute, or injects new facts harmful to the accused into the trial proceeding. *Wesbrook*, 29 S.W.3d at 115. To determine whether the defendant's substantial rights were affected by improper argument, we consider: (1) the magnitude of the prejudicial effect of the State's statements; (2) the efficacy of any curative or cautionary instructions; and (3) the strength of the evidence supporting the conviction. *See Berry v. State*, 233 S.W.3d 847, 858–59 (Tex. Crim. App. 2007).

Nickerson contends that the State made various misstatements of law and fact throughout the closing argument that violated his substantial rights. *See* Tex. R. App. P. 44.2(b). He first complains of the State's reference to the charge instruction that the jury cannot consider the defendant's failure to testify as

28

evidence of his guilt. After stressing the importance of the Fifth Amendment privilege, the State added, "Having said that, let me tell you this. You've got his statement. It is in evidence." Defense counsel interposed an objection, which the trial court overruled.

In considering whether the State violated the defendant's Fifth Amendment right by commenting on his failure to testify, "[w]e view the State's argument from the jury's standpoint and resolve any ambiguities in the language in favor of it being permissible argument." *Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011). Here, the State was reminding the jury about Nickerson's confession, not emphasizing his silence at trial. Because the language was not "manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify," we hold that the trial court did not abuse its discretion in overruling Nickerson's objection to the State's statement. *See id.*; *see also Garcia v. State*, 126 S.W.3d 921, 924 (Tex. Crim. App. 2004) (holding that prosecutor did not comment on defendant's failure to testify by referencing defendant's written statement and pointing out what defendant did not say).

Further, the charge instructed the jury that

[a] defendant in a criminal case is not bound by law to testify in his own behalf therein and the failure of any defendant to so testify shall not be taken as a ·circumstance against him nor shall the same be

29

alluded to nor commented upon by the jury, and you must not refer to, mention, comment upon or discuss the failure of the defendant to testify in this case. If any juror starts to mention the defendant's failure to testify in this case then it is the duty of the other jurors to stop him at once.

This instruction cured any harm that otherwise might have resulted from the jury's interpretation of the State's statement. We generally presume that the jury followed the court's instructions. *See Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996).

Nickerson also contends that the State impermissibly attempted to lean on the jury's emotions and invited them to speculate about the existence of evidence beyond the record in the following statement:

> [Barragan] [m]ade the mistake of trusting his friend. And but for [Nickerson], [Barragan] wouldn't be dead and neither would [Briagas] and neither would [Morales]. Because of what [Nickerson] did, that poor boy bled out on the concrete all alone. And I would hope if that were your child, you would want the person responsible to be held accountable.

A prosecutor may invite the jury to make reasonable deductions from the evidence and "consider the full, unvarnished specter of the defendant's actions." *Torres v. State*, 92 S.W.3d 911, 921 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *see Linder v. State*, 828 S.W.2d 290, 303 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd) (prosecutor's argument asking jurors to imagine what it was like to be victim was summation of evidence before jury, was more focused on

defendant's actions and victim's reactions, not jurors themselves, and as such, was not improper). On the other hand, a prosecutor should not ask jurors to place themselves in the shoes of the victim of the charged offense, or in the shoes of others affected by it. *See Brandley v. State*, 691 S.W.2d 699, 712 (Tex. Crim. App. 1985); *Torres*, 92 S.W.3d at 920. The trial court acted within the zone of reasonable disagreement in sustaining Nickerson's objection to the portion asking the jurors to consider their feelings if Barragan had been their child. Standing alone, however, the erroneous statement was not the kind of extremely prejudicial or manifestly improper error that only a new trial can cure. We therefore hold that the trial court acted within its discretion in denying Nickerson's motion for mistrial based on that remark.

Nickerson also complains that the State misstated the law when it said that Nickerson knew McFarland planned to have a gun and "that information alone is sufficient to establish the conspiracy." The trial court overruled his objection. The statement of law appears incorrect only when taken out of context. The State premised that section of its argument by explaining that both Nickerson and McFarland confessed, establishing their identities and that they were the responsible parties, and leaving for the jury only the issue of whether Nickerson had the intent to form a conspiracy to commit robbery or attempted robbery. The State also prefaced its remark concerning Nickerson's knowledge of the gun by

31

arguing that Nickerson knew that neither he nor McFarland had the money to pay for the marijuana. In referring to proof of the conspiracy, therefore, the State focused the jury on whether the evidence proved Nickerson had acted "with intent to promote or assist the commission" of the planned robbery. *See* TEX. PENAL CODE ANN. § 7.02(a)(2). The trial court acted within its discretion in overruling Nickerson's objection to the State's statement.

With respect to Nickerson's complaint that the factual references in the State's statement lacked support in the record, Nickerson correctly acknowledges that the State is allowed wide latitude in drawing inferences from the evidence as long as they are reasonable, fair, legitimate, and offered in good faith. *Brown*, 270 S.W.3d at 572 (quoting *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988)). But "[i]mproper references to facts that are neither in evidence nor inferable from the evidence are generally designed to arouse the passion and prejudice of the jury and, as such, are inappropriate." *Freeman v. State*, 340 S.W.3d 717, 728 (Tex. Crim. App. 2011) (citing *Borjan v. State*, 787 S.W.2d 53, 57 (Tex. Crim. App.1990)).

We consider each portion of the statement that Nickerson claims to be unsupported by the evidence in turn:

- *Barragan "bled out on the concrete alone."*

At trial, the medical examiner testified about the lethal bullet's trajectory through Barragan's back, lung, heart, and chest, explained that the wound caused nearly one liter of blood to pool in Barragan's left pleural cavity, and opined that Barragan did not die immediately, but bled to death as a result of the gunshot wounds. The first officer to arrive at the scene testified that he saw someone lying motionless beside the truck and noticed the blood as he approached. He acknowledged that he had never seen that much blood at a crime scene before. In his statement, Nickerson recounted that he ran from the truck as soon as McFarland began shooting. The State drew reasonable inferences from this evidence in describing the circumstances surrounding Barragan's death.

- *Nickerson knew that neither he nor McFarland had the money to pay for five pounds of marijuana.*

Walton testified that Nickerson and McFarland discussed making money from selling the marijuana if they could obtain it, but they never discussed the cost or how they would pay for it; they just said "we need to figure something out." In his statement to police, Nickerson recounted that he initially told Barragan he could buy only $20 worth of marijuana. Nickerson also said that he assumed McFarland got some money from a female acquaintance because of an earlier conversation, but he also admitted he knew McFarland usually had no money and that he planned to bring a firearm with him. McFarland knew that Nickerson had planned to buy only a $20 bag, but after discussing the quantity of marijuana

33

Barragan had available, Nickerson called Barragan to request an amount that would have cost hundreds of dollars. And, Nickerson confessed to knowing that McFarland intended to steal the marijuana rather than buy it before the two approached the truck.

The trial court did not rule on Nickerson's objection to the statement, but sua sponte instructed the jury: "[The] jury's heard the evidence. They'll consider what they've heard." This instruction was enough to eliminate any prejudice that might have arisen from the State's statement.

- *Nickerson made telephone calls to "set up" Barragan.*

Nickerson correctly points out that Barragan first contacted Nickerson and told Nickerson that several bales of marijuana were available. Nickerson responded that he wanted to buy only a small amount but, after telling McFarland that Barragan had a large amount of marijuana available, Nickerson called Barragan to inform him that he knew someone who wanted five pounds, thereby initiating the transaction that included McFarland. Nickerson further coordinated the delivery by calling Barragan during the afternoon and arranging to meet him in the park. The record supports the State's statement.

- *Barragan wanted to become a fireman.*

Barragan's father testified at trial that because of Barragan's interest in becoming a firefighter, the family supported his transfer to an alternative school so

that he could "catch up faster" on his schooling. This testimony supports the prosecutor's reference to Barragan's desire to become a firefighter.

- *Barragan planned to buy a birthday present for his father.*

Barragan was killed the night before his father's birthday. His father testified that he texted Barragan the evening after the murder to tell him to come home because the family was going to cut the birthday cake. Affording the State the wide latitude it receives in closing, it was not unreasonable to allow an inference from the evidence that Barragan planned to bring his father a birthday present.

- *Barragan trusted Nickerson.*

In his statement, Nickerson acknowledged that he had known Barragan for two or three years. He did not have Barragan's phone number saved on his cell phone; Barragan did not have Nickerson's number saved on his cell phone either. Nevertheless, Barragan chose to call Nickerson and let him know about the large quantity of marijuana. This evidence makes it reasonable to infer that Barragan trusted Nickerson enough to expect a nonviolent exchange of money for marijuana.

Nickerson argues that the cumulative effect of the purported errors was harmful. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) (citing *Stahl v. State*, 749 S.W.2d 826, 832 (Tex. Crim. App. 1988)); *Melancon v. State*, 66 S.W.3d 375, 385 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). Non-errors, however, do not produce harm in their cumulative effect. *Hughes v. State*, 24 S.W.3d 833, 844 (Tex. Crim. App. 2000); *Melancon*, 66 S.W.3d at 385.

**Conclusion**

We affirm the judgment of the trial court.



Jane Bland
Justice

Panel consists of Justices Jennings, Bland, and Brown.