

# NUMBER 13-20-00548-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**ANTHONY LEXINGTON KOPYCINSKI,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

### On appeal from the 149th District Court
### of Brazoria County, Texas.

---

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Tijerina
Memorandum Opinion by Justice Benavides**

It is undisputed that appellant Anthony Lexington Kopycinski shot and killed Ginger Jackson. Kopycinski claimed that Jackson's death was the result of an accidental discharge while he was cleaning his gun, and the State alleged that the killing was intentional. A jury convicted Kopycinski of murder and sentenced him to life imprisonment.

*See* TEX. PENAL CODE ANN. §§ 12.32(a), 19.02(c).

On appeal, Kopycinski argues that the trial court erred by (1) allowing the State to improperly comment on his failure to testify, and (2) allowing the medical examiner to offer an unqualified and unreliable opinion about his position in the room when the weapon was fired.[1] We affirm.

## I.    BACKGROUND

On September 23, 2018, Kopycinski called 911 and told the dispatcher "that a gun accidently went off in the house and it hit [Jackson]." Kopycinski explained that there had been an intruder the night before, so he had retrieved the gun from his mother's room. He also told the dispatcher that Jackson was lying in bed and that he was cleaning the gun when it accidentally discharged. The dispatcher asked Kopycinski when the incident had occurred, and he responded, "Just a minute ago." When prompted a second time, Kopycinski said, "About fifteen minutes ago." A recording of the 911 call was later admitted into evidence and played for the jury.

Deputy Jay Hargrave from the Brazoria County Sheriff's Office was the first officer on the scene. His bodycam video was admitted into evidence as "State's Exhibit 5" and played for the jury. In the following still from the video, Kopycinski demonstrates where he was standing in relation to Jackson when the gun discharged:[2]

---

[1] This appeal is before the Court on transfer from the First Court of Appeals in Houston pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

[2] We have altered the image by blurring Jackson's face.



Dr. Dana Hopson, the medical examiner who performed Jackson's autopsy, testified that she observed a gunshot entry wound on the top left side of Jackson's head, near the midline, and recovered the largest bullet fragment near the bottom right portion of Jackson's skull. Using these two points, along with X-rays of Jackson's brain, Dr. Hopson was able to determine the trajectory of the bullet as it passed through Jackson's head: "Left to right, downward, and slightly front to back."[3] The State then played Hargrave's bodycam video for Dr. Hopson. Over Kopycinski's objections, Dr. Hopson opined that, based on Jackson's position in the video, Kopycinski's version of events was "inconsistent" with her findings regarding the entry wound and the trajectory of the bullet.

Multiple officers testified that they searched the room for gun cleaning supplies but

---

[3] The trial court also admitted two photos, State's Exhibits 39 and 40, showing Dr. Hopson using a metal probe to demonstrate the trajectory of the bullet through Jackson's skull.

found none. A .22 caliber casing was found under the foot of the bed, but there was no firearm in the room. Officer Derek Dyson testified that a rifle was recovered from an adjacent bedroom that was later identified as Kopycinski's mother's bedroom. According to Officer Dyson, the mother's bedroom was locked when police arrived, and the officers had to manipulate the lock to gain entry to her room. The gun's magazine was missing, and officers failed to locate any other ammunition in the house.

Sean Daniel, a firearms expert employed by the Texas Department of Public Safety, testified that he was able to confirm that the casing and fragments recovered from Jackson's head were fired from the rifle recovered by police, which he identified as a Beretta ARX160 semiautomatic rifle. He also conducted a trigger pressure test and determined that on average, the rifle required approximately seven and one-half pounds of pressure to fire the weapon.

Finally, the State presented forensic evidence extracted from Kopycinski's cell phone. Kopycinski called someone named "Matt" at 11:21 A.M., and the call lasted thirty-nine seconds. Kopycinski also dialed 911 at 11:21 A.M. but did not hit the call button to actually initiate the call until 12:02 P.M. Eighteen minutes later, at 12:20 P.M., Kopycinski received a text message from "Mom" that read, "did you call police." Prior to that text, there is no record of Kopycinski using his cell phone to communicate with his mother that day.

Kopycinski elected not to testify. The jury returned a guilty verdict, and this appeal ensued.

4

## II. COMMENT ON APPELLANT'S FAILURE TO TESTIFY

By his first issue, Kopycinski contends that the trial court erred when it overruled his objection that the State made an improper comment during its closing argument on his decision not to testify.

### A. Standard or Review & Applicable Law

A trial court's ruling on an objection to improper jury argument, such as an improper comment on a defendant's decision not to testify, is reviewed for abuse of discretion. *Cantu v. State*, 395 S.W.3d 202, 209 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (citing *Garcia v. State*, 126 S.W.3d 921, 924 (Tex. Crim. App. 2004)). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement; that is, when the decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Henley v. State*, 493 S.W.3d 77, 83 (Tex. Crim. App. 2016) (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)).

A defendant in a criminal trial cannot be compelled to give evidence against himself. U.S. CONST. amend. V; TEX. CONST. art. I, § 10. To protect this constitutional privilege, a defendant's failure to testify cannot be weighed against him, and counsel is prohibited by statute from alluding to or commenting on the circumstance. TEX. CODE CRIM. PROC. ANN. art. 38.08. Therefore, a comment on a defendant's failure to testify is both a constitutional and statutory violation. *Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011).

When reviewing a potential violation, we view the State's argument from the jury's standpoint and resolve any ambiguities in favor of it being a permissible argument. *Id.* An

implied or indirect allusion to a defendant's failure to testify is insufficient; rather, for a violation to occur, the language used must be such that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify. *Id.* (citing *Bustamante v. State*, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001)). In making this determination, the reviewing court must consider the context in which the comment was made. *Id.* (citing *Bustamante*, 48 S.W.3d at 765).

The State may reference prior statements made by the defendant that were admitted into evidence. *Garcia v. State*, 126 S.W.3d 921, 924 (Tex. Crim. App. 2004). Making a comparison between those statements and other evidence is not a comment on the defendant's failure to testify. *Id.*

**B.    Analysis**

Kopycinski did not testify at trial, but recordings of his 911 call and his videotaped statement to police were admitted into evidence and played for the jury. During closing arguments, the State emphasized the inconsistencies in Kopycinski's accidental-discharge theory, and the following exchange occurred:

| STATE: | Look, credibility is entirely important. There's nothing in here that says that the defendant is to be presumed honest. There's nothing in here that the defendant is to be presumed believable. |
|---|---|
| KOPYCINSKI: | Judge, I'm going to object at this point. This is a comment on the defendant testifying in this trial. |
| COURT: | Overruled. |
| STATE: | I'm referencing State's Exhibit 5 and the 9-1-1 call[,] and I guarantee you—I am begging you to listen to the 9-1-1 call. I want you to listen to the 9-1-1 call. I hope |

the defense plays it for you. I want them to because there's [sic] so many inconsistencies, and I'll point them out for you. But the believability, you have to judge his credibility like you would any witness that took the stand. Okay? Was he being truthful to the 9-1-1 operator?

KOPYCINSKI: I'm going to object one more time regarding the defendant testifying. We just compared his credibility to witnesses on the stand. So we've effectively commented on him not testifying.

COURT: Overruled.

Contrary to Kopycinski's suggestion, the State was permitted to refer to his prior statements and draw comparisons between those statements and other evidence. *See Garcia*, 126 S.W.3d at 924. Further, by asking the jury "to judge [Kopycinski's] credibility like you would any witness that took the stand," the State was merely reiterating the jury's role as the trier of fact. *See* TEX. CODE CRIM. PROC. ANN. art. 36.13 ("[T]he jury is the exclusive judge of the facts, but it is bound to receive the law from the court and be governed thereby."). At most, the comment could be viewed as an implied or indirect allusion to Kopycinski's failure to testify. *See Randolph*, 353 S.W.3d at 891. Thus, because Kopycinski's rights were not violated, the trial court did not abuse its discretion by overruling his objection. *See Cantu*, 395 S.W.3d at 209. Kopycinski's first issue is overruled.

### III.    EXPERT TESTIMONY

By his second issue, Kopycinski argues that the trial court erred when it overruled his objections to the medical examiner's opinion regarding Kopycinski's position in the room when the gun was fired. More specifically, Kopycinski argues on appeal that the

7

State failed to establish that Dr. Hopson had "the requisite expert knowledge or sufficient information required to establish an opinion as to the trajectory of the bullet which struck [Jackson]." We regard these as two separate arguments: (1) Dr. Hopson was not qualified to offer an opinion on the subject matter; and (2) even if she was qualified, her opinion was unreliable.

## A.     Standard of Review & Applicable Law

A trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019) (citing *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006)). "An expert witness may offer an opinion if he is qualified to do so by his knowledge, skill, experience, training or education and if scientific, technical or other specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue." *Id.* (citing TEX. R. EVID. 702). When admitting expert testimony, the trial court must be satisfied that: "(1) The witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case." *Id.* (quoting *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006)). These three criteria are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Id.*

## B.     Dr. Hopson's Testimony

Dr. Hopson is licensed to practice medicine in Texas, and she is board certified in anatomic and clinical pathology, as well as forensic pathology. At the time of trial, Dr. Hopson had been employed with Harris County for approximately six years and had

8

performed more than 1,600 autopsies.

After Dr. Hopson testified at length, without objection, about her findings regarding the entry wound and the trajectory of the bullet as it passed through Jackson's head, the State showed Dr. Hopson the bodycam video taken at the scene, and the following exchange occurred:

STATE: Dr. Hopson, based on what you just observed and based on the autopsy that you performed, can you describe for the jury the angle or if the angle in which [Kopycinski] says that he was standing at was probable with where you found the bullet?

KOPYCINSKI: Judge, I'm going to object, couple things. One, I don't think this witness had been qualified as a firearms expert, a muzzle direction or a muzzle velocity expert, again. And then, two, without knowing the position of the body at the time of the gunshot, I don't see how she can make this sort of guess, if you will.

COURT: All right. I'll overrule that. She can tell us what she can and can't testify to.

HOPSON: So based on the autopsy findings, the entrance, as I mentioned, was near the top of the left side of her head; and the bullet continued from the left towards the right. It went downward, and it was slightly front to back. So it went from what we call the parietal bone more towards the temporal bone; so, that's slightly front to back.

STATE: And did you hear [Kopycinski] and how he stated how he was standing?

. . . .

HOPSON: I heard and saw where he stated he was standing.

STATE: Okay. And based on what you saw and heard and based on your findings of the path, can you testify

9

whether or not that angle is possible from where he was standing?

HOPSON: Based on the way that she is positioned in the bed in this video and based on the location of her entrance wound and the trajectory, it's inconsistent with where he states he was standing.

## C. Qualification

The key inquiry in evaluating an expert's qualifications is the fit between the subject matter at issue and the expert's familiarity with it. *Davis v. State*, 329 S.W.3d 798, 813 (Tex. Crim. App. 2010) (citing *Vela*, 209 S.W.3d at 133). As the medical examiner who conducted Jackson's autopsy and determined the cause and manner of her death, Dr. Hopson was clearly qualified to testify about the entry wound and the trajectory of the bullet as it passed through Jackson's head. *See, e.g.*, *Nickerson v. State*, 478 S.W.3d 744, 763 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (noting that "the medical examiner testified about the lethal bullet's trajectory through Barragan's back, lung, heart, and chest"); *see also Curry v. State*, No. 01-19-00942-CR, 2021 WL 2793473, at *3 (Tex. App.—Houston [1st Dist.] July 6, 2021, pet. ref'd) (mem. op., not designated for publication) ("The medical examiner traced the trajectory of the bullet—from its entry at Thompson's lower lip, 'downwards, front to back and right to left' through her neck to her left lung—and testified that it was not consistent with a self-inflicted wound.").

Nevertheless, Kopycinski asserts that Dr. Hopson was not qualified to testify about Kopycinski's position in the room when the gun was fired because only a ballistics expert would be qualified to give such an opinion. But as the State points out, medical examiners commonly testify about the orientation of the shooter and the victim based on the location

10

of the entry wound and the bullet's path through the victim's body. *See, e.g.*, *Braughton v. State*, 522 S.W.3d 714, 733 (Tex. App.—Houston [1st Dist.] 2017), ("[The medical examiner] also testified that the bullet, which came primarily from a shooter facing Dominguez's right side, entered 'slightly' from Dominguez's back, not from a gun pointing 'straight ahead' at Dominguez's chest."), *aff'd*, 569 S.W.3d 592 (Tex. Crim. App. 2019); *see also Guyger v. State*, No. 05-19-01236-CR, 2021 WL 5356043, at *2 (Tex. App.—Dallas Nov. 17. 2021, pet. ref'd) (not designated for publication) ("[The medical examiner] explained the bullet's path indicated that either the shooter was standing over Jean and shooting down, or Jean was lying down or bent forward, in the process of getting up from the couch or ducking."); *Eisenman v. State*, No. 13-05-705-CR, 2008 WL 2515877, at *7 (Tex. App.—Corpus Christi–Edinburg Jan. 10, 2008, pet. ref'd) (mem. op., not designated for publication) (finding evidence legally sufficient to support murder conviction where, among other evidence, the medical examiner "testified that the path and location of the gunshot wounds received by Eisenman revealed that they were most likely inflicted while he was falling or seated, and that they were most likely inflicted by a shooter who was in a higher position than Eisenman's body"). Kopycinski has not pointed us to any case where a medical examiner was deemed unqualified to offer such an opinion, and we have found none.

Moreover, "[i]f the expert evidence is close to the jury's common understanding, the witness's qualifications are less important than when the evidence is well outside the jury's own experience." *Davis v. State*, 313 S.W.3d 317, 350 (Tex. Crim. App. 2010) (quoting *Rodgers*, 205 S.W.3d at 528). "For example, DNA profiling is scientifically

complex; latent-print comparison (whether of fingerprints, tires, or shoes) is not." *Rodgers*, 205 S.W.3d at 528. Here, it did not take advanced degrees or specialized knowledge in ballistics to visually compare the entry wound and the trajectory of the bullet through Jackson's head, with Jackson's position in the bed, and Kopycinski's purported position in the room. It is evident from the above image that these three pieces of evidence are, as Dr. Hopson testified, "inconsistent."

We defer to the trial court's determination that, as an experienced medical examiner, Dr. Hopson was qualified to offer an opinion about Kopycinski's purported position when the gun discharged. We overrule this sub-issue.

## D.      Reliability

Scientific evidence is reliable if: (1) the underlying scientific theory is valid; (2) the technique applying the theory is valid; and (3) the technique was properly applied on the occasion in question. *Layton v. State*, 280 S.W.3d 235, 241 (Tex. Crim. App. 2009) (citing *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992)). Kopycinski does not dispute that a qualified expert can reliably determine the relative positions of a shooter and a victim; instead, Kopycinski argues that Dr. Hopson lacked the necessary information to make such a calculation. In other words, he contends that the valid technique was not properly applied. *See id.*

In particular, Kopycinski contends on appeal that Dr. Hopson did not possess the following necessary information to proffer a reliable opinion: Jackson's position when the gun discharged, as opposed to her position in the video, which depicts her after she had been struck; Kopycinski's height; the distance between Kopycinski and Jackson; and how

12

Kopycinski was holding the rifle when it discharged (e.g., at his shoulder or with his arms hanging down). According to Kopycinski, without this information, Dr. Hopson's opinion had "no measured or technical support" and was instead based on "speculation."

We note that Kopycinski's reliability objection at trial was limited to the unknown "position of [Jackson's] body at the time of the gunshot." Even if we assume that Kopycinski's argument on appeal about other unknown information is a natural extension of this objection, we conclude that Dr. Hopson's opinion was sufficiently reliable.

First and foremost, Dr. Hopson qualified her opinion by saying that it was "[b]ased on the way that [Jackson] is positioned in the bed in this video." Dr. Hopson explained on cross-examination that she intentionally limited her opinion because, other than Kopycinski generally stating that Jackson was lying on the bed when the gun discharged, she could not be certain of Jackson's exact position on the bed at the time of impact. Therefore, Dr. Hopson's opinion was rooted in observable facts, not "speculation," as Kopycinski contends.

Next, Kopycinski's argument that additional information was necessary to form a reliable opinion is belied by the fact that Kopycinski himself asked Dr. Hopson for her opinion under a different scenario using the same information:

KOPYCINSKI: Okay. Well, let's say [Jackson] was laying facedown in that bed with her feet oriented slightly to the corner and her head oriented more towards the center of the bed and she was—and Mr. Kopycinski was about where he stated. Would that get you that same left side entrance wound and then traveling—the bullet traveling through the brain towards the right side?

13

HOPSON:              Yes. If she is positioned facedown, then—and the—
                     and her head is tilted as you're describing, then the
                     bullet is still entering on the left side of her head and
                     then going from the left towards the right.

KOPYCINSKI:          Okay. So that's the key; right? We got to know how
                     [Jackson] was laying when she was shot, not 30
                     minutes, 20 minutes later when she's found by
                     deputies; right?

HOPSON:              Correct. That's why I [limited my opinion to the way]
                     she was positioned in the video[.]

If Dr. Hopson had sufficient information to agree with Kopycinski's alternative scenario, then it stands to reason that she also had sufficient information to form an opinion regarding the State's scenario. Each opinion relied exclusively on a visual comparison of Kopycinski's purported position in the room, Dr. Hopson's undisputed autopsy findings, and a given position for Jackson on the bed.

Finally, we simply disagree that Dr. Hopson needed any additional information to form a reliable opinion. As discussed previously, it is apparent from the above image that when the rifle was fired, either Kopycinski was in an entirely different position in the room, as the State posited, or Jackson was lying in a much different position on the bed, as Kopycinski urged. Kopycinski's height, how he held the rifle, and the distance between him and Jackson were not variables Dr. Hopson needed to know to draw a conclusion concerning either alternative scenario. Thus, we conclude that Dr. Hopson's testimony was reliable because it "took into account enough of the pertinent facts to be of assistance to the trier of fact on a fact in issue." *Vela*, 209 S.W.3d at 133 (quoting *Jordan v. State*, 928 S.W.2d 550, 556 (Tex. Crim. App. 1996)). Kopycinski's second issue is overruled.

14

## IV.    CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
26th day of May, 2022.

15