**Opinion issued August 30, 2018**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-16-00541-CR

————————————

**REYMUNDO HAMELTON GARCIA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 179th District Court**
**Harris County, Texas**
**Trial Court Case No. 1442404**

---

## MEMORANDUM OPINION

A jury found appellant, Reymundo Hamelton Garcia, guilty of the felony

offense of murder[1] and assessed his punishment at confinement for twenty years.  In

---

[1]  *See* TEX. PENAL CODE ANN. § 19.02(b), (c) (Vernon 2011).

two issues, appellant contends that the trial court erred in denying his motion to suppress evidence and excluding the testimony of his expert witness during the guilt phase of trial.

We affirm.

## Background

Adan Lopez Paz testified that in November 2013, he lived in an "apartment" in a warehouse, while the complainant, Ernest Ybarra, lived at the same property in a trailer. On the night of November 5, 2013, Paz, while sleeping, was awakened by a "bang," a "loud" "hard bang." At the same time, he heard his car alarm sound, and he thought that someone, who was "drunk," had "hit [his] car." Paz then heard the complainant yelling and loudly screaming for about twenty minutes. "[S]cared," Paz stayed inside his apartment and telephoned the owner of the property, Abel Trevino, to tell him that "there was somebody that was crazy" outside of his apartment. When the screaming stopped, Paz opened his apartment door and saw the complainant on the ground. Thinking that the complainant was "drunk," Paz walked passed him, went to look at his car, and moved it to another location on the property.

After Paz moved his car, Trevino arrived at the property and asked Paz what had happened. Trevino and Paz then went to "check[] . . . out" the complainant. When Trevino touched the complainant to "see if he was okay," he discovered that

2

the complainant had been shot and was dead.  As Trevino and Paz walked out of the area where the complainant was located, they saw appellant, who was "c[oming] out of []his trailer" with a firearm, a "large" revolver, ".38, .357 [caliber]."  Appellant had a conversation with Trevino, which Paz did not hear.  And Trevino called for emergency assistance.

The next day, Paz notified a law enforcement officer who was at the property that he had found a bullet in the taillight of his car.  He, at the officer's request, then moved his car back to the location where it had been the previous night when his car alarm had sounded.

Paz explained that although he had "[n]ever had any issues" with the complainant, he had stayed away from the complainant because he had "heard that he was a bully" and "liked to pick on people for no reason."  Paz noted, however, that he had never actually seen the complainant drunk or "picking on people."  And he had never seen the complainant "walking around with two big knives."

Trevino testified that he owns approximately ten properties, including a warehouse with "a couple of apartments" inside.  He also has several trailers on the warehouse property that he rents to homeless individuals.  Trevino explained that the complainant had rented a trailer at the warehouse property for more than a year.  Although the complainant would play music loudly outside of his trailer, Trevino had never received any complaints about the music.

3

On the night of November 5, 2013, Trevino, who was not at the warehouse property, received a telephone call from Paz. Trevino arrived at the property within ten minutes of the telephone call and found Paz, who had just moved his car. Trevino then went to appellant's trailer, and appellant "walked out" holding "a gun in his hand." Because Trevino "did not like guns on [his] property" and appellant had only been living in his trailer for one day, he told appellant to leave. At the time, appellant appeared "[n]ormal" and did not tell Trevino about the shooting or that he had felt threatened. According to Trevino, the firearm that he saw in appellant's hand was a "big gun," a revolver, "like a .357 [caliber]."

After Trevino told appellant to leave the property, appellant went back into his trailer and came out with a box. Trevino did not see appellant's firearm, but he believed that it was inside the box. After appellant left the property, Trevino then began looking for the complainant because "the door of his trailer was open" and he was "missing." Trevino found the complainant in a hallway in a fetal position. Thinking that the complainant was "drunk," he "pushed him," but the complainant did not move. Trevino ran outside, retrieved his cellular telephone from his truck, and called for emergency assistance, telling the operator that appellant was "getting away."

Trevino explained that at the time he asked appellant to the leave the property, he "didn't know what had happened." He noted that he did not see any firearms,

4

knives, or weapons near the complainant. In fact, Trevino did not see any firearm that night, other than the one that appellant was carrying. And he denied telling the other tenants at the property that the complainant was "trouble."

Houston Police Department ("HPD") Sergeant C. Howard testified that on the night of November 5, 2013, he and his partner, HPD Officer R. Lujan, responded to a call regarding "a homicide scene." Howard noted that appellant had been living in "a little shed," or trailer, on the warehouse property. After law enforcement officers obtained a warrant to search the trailer in which appellant had been living, they found, outside of the trailer, various items. And inside of the trailer, the officers found "a .38 caliber cartridge casing."

Sergeant Howard further explained that he found the complainant, who also resided in a trailer on the warehouse property, in "a fetal position" and "crouched down" in the back of a building on the property. The complainant did not have a firearm in his possession, and law enforcement officers did not find any weapons or firearms in his trailer. However, the complainant did have utensils and knives in the kitchen of his trailer.

After obtaining an arrest warrant for appellant, Sergeant Howard and Officer Lujan met him at a restaurant, where he told them that he was not armed and had "got[ten] rid of the gun." Later, at an HPD station, appellant gave a statement to

Howard.[2] Appellant stated that during the night of the shooting, "it was dark" and the complainant had been playing music loudly. After appellant, who was standing in the doorway of his trailer, asked the complainant to turn down the music, the complainant threw down his bag, put his hand in his pocket, and came toward appellant. Appellant then shot the complainant, but "in self-defense." Appellant did not tell Howard that the complainant had a firearm or a weapon that night.

According to Sergeant Howard, the complainant was shot on his "front side." And both Trevino and Paz identified appellant as the person that they had seen at the warehouse property with a firearm on the night of November 5, 2013. Howard noted that a firearm is a deadly weapon and capable of causing serious bodily injury.

Officer Lujan testified that on the night of November 5, 2013, he and Sergeant Howard arrived at the homicide scene, where he interviewed several witnesses, including Trevino and Paz. While at the scene, he and Howard determined that appellant had recently "moved into . . . a small shack-type structure" or trailer on the warehouse property. And Lujan obtained a search warrant for appellant's trailer, which Howard and HPD Officer J. Oliphant then searched.

On November 6, 2013, Officer Lujan returned to the homicide scene, where he found "some live rounds" outside of appellant's trailer. Specifically, Lujan

---

[2] The trial court admitted into evidence the videotape recording of appellant's statement to Sergeant Howard.

found, in a "green and white shoebox," "a box of Monarch brand . . . .38 caliber ammunition" and, in a black suitcase, a "small plastic bag" with "six rounds" of ".357 [caliber] . . . bullets." While Lujan was at the scene, Paz alerted him to "a bullet fragment" that he had found in the taillight of his car. Lujan then asked Paz to move his car back to the location where it had been the previous night. As part of his investigation, Lujan determined that a bullet "went through" the complainant and struck Paz's car.

In regard to appellant's statement to Sergeant Howard, Officer Lujan explained that appellant had stated that he had been warned that the complainant was "trouble," appellant had asked the complainant to turn down his music, and when the complainant came toward appellant, he shot him once. Lujan further noted that appellant had told law enforcement officers that he had thrown away his firearm, which the officers were not able to locate the firearm.

Dr. Dwayne Wolf, deputy chief medical examiner at the Harris County Institute of Forensic Sciences, testified that he performed an autopsy on the body of the complainant, who died at the scene on November 5, 2013. Wolf explained that the complainant had suffered a gunshot wound to the front left side of his chest. The bullet had traveled from the left side of the complainant's body to the right side, and from the front of his body to the back, before exiting. Wolf opined that the complainant had been shot by an individual standing more than two and a half feet

7

away from him. And as a result of being shot, he had suffered serious bodily injury that was clearly dangerous to human life.[3] His cause of death was a "[g]unshot wound to the chest." And the manner of death was homicide.

## Suppression of Evidence

In his first issue, appellant argues that the trial court erred in denying his motion to suppress evidence because the arrest and search warrants obtained by law enforcement officers "contained conflicting information" and, thus, "it [was] obvious that the information [contained in the warrants] was fabricated"; the arrest and search warrants "lacked the requisite language needed for proper execution"; and the arrest and search warrants "d[id] not give rise to probable cause."

We review a trial court's denial of a motion to suppress evidence under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for an abuse of discretion and the trial court's application of the law to the facts de novo. *Id.* We generally consider only the evidence adduced at the suppression hearing unless the parties consensually re-litigate the issue at trial. *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). At a suppression hearing, the trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility, and it may choose to believe or

---

[3]     During his testimony, Dr. Wolf described in detail the complainant's internal injuries caused by the gunshot wound.

disbelieve all or any part of the witnesses' testimony. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When, as here, a trial court does not make explicit findings of fact, we review the evidence in a light most favorable to the trial court's ruling. *Walter v. State*, 28 S.W.3d 538, 540 (Tex. Crim. App. 2000). We give almost total deference to a trial court's implied findings, especially those based on an evaluation of witness credibility or demeanor. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We will sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Id.* at 447–48.

Prior to trial, appellant generally moved to suppress "[t]he fruits" of his "arrest and detention" without specifying any particular evidence to be suppressed. At the hearing on his motion to suppress evidence, appellant again generally moved for the court "to suppress any evidence . . . seized in connection with either the arrest [warrant] or the search warrant" without specifying any particular evidence that he sought to be suppressed. On appeal, appellant again generally complains that the trial court "should have suppressed all evidence obtained as a result" of the arrest and search warrants. However, he also specifically asserts that the trial court erroneously allowed "a gun that was the fruit of [law enforcement] officer[s'] illegal search" to be admitted into evidence.

In deciding whether to address the merits of an appeal from the denial of a motion to suppress, we must first identify the "fruits" that the trial court declined to suppress. *Gonzales v. State*, 966 S.W.2d 521, 524 (Tex. Crim. App. 1998) (internal quotations omitted); *see also Miller v. State*, 312 S.W.3d 162, 166 (Tex. App.—Fort Worth 2010, no pet.); *Brennan v. State*, 140 S.W.3d 779, 781 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). Second, an appellate court must determine whether the "fruits" were "somehow" used by the State. *Gonzales*, 966 S.W.2d at 524 (internal quotations omitted). If it is not clear from the testimony and exhibits what the "fruits" are, then an appellate court need not address the merits of the defendant's claim. *Id.* (internal quotations omitted); *see also Miller*, 312 S.W.3d at 166; *Brennan*, 140 S.W.3d at 781. "Likewise, if the fruits have not somehow been used by the State," then the appellate court again need not address the merits of the defendant's claim. *Gonzales*, 966 S.W.2d at 524 (internal quotations omitted).

To the extent that appellant complains generally that the trial court erred in not suppressing "all evidence obtained as a result" of the arrest and search warrants, we note that such a generalized argument fails to identify specific items of evidence or categories of evidence that appellant sought to exclude by challenging his arrest warrant and the warrant to search his trailer. Thus, he presents nothing for our review. *See Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005); *Miller*, 312 S.W.3d at 166 (defendant presented nothing for review where his motion sought

10

to suppress "any evidence obtained pursuant to the warrants" and brief stated he "sought to suppress all evidence seized" (internal quotations omitted); *Brennan*, 140 S.W.3d at 781 (global request to suppress "all evidence seized or obtained" from alleged illegal searches and failure "to identify what, if any, evidence was ruled upon by the denial" of suppression motion, presented nothing for appellate review (internal quotations omitted)); *see also Massey v. State*, 933 S.W.2d 141, 148 (Tex. Crim. App. 1996).

In regard to appellant's specific complaint on appeal that the trial court erroneously allowed "a gun that was the fruit of [law enforcement] officer[s'] illegal search" to be admitted into evidence, we note that appellant's firearm was not admitted into evidence at trial.[4] And he has not identified any other evidence related to his firearm that was discovered as a result of the challenged warrants. Accordingly, we need not address the merits of appellant's firs issue. *Gonzales*, 966 S.W.2d at 524 (court need not address merits of defendant's complaint where "the fruits have not somehow been used by the State" (internal quotations omitted)).

### Exclusion of Expert Testimony

In his second issue, appellant argues that the trial court erred in excluding, during the guilt phase of trial, the testimony of his expert witness, Dr. Darrel Turner,

---

[4] Sergeant Howard and Officer Lujan both testified that law enforcement officers were not able to locate the firearm used in the offense and appellant told law enforcement officers that he had thrown his firearm away.

11

regarding post-traumatic stress disorder ("PTSD") because Turner's testimony "showed [a]ppellant's mental status at the time of the offense" and "in all prosecutions for murder, . . . [a] defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing . . . together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." *See* TEX. CODE CRIM. PROC. ANN. art. 38.36(a) (Vernon 2018). Appellant further argues that he was harmed by the exclusion of Turner's testimony about PTSD because "[b]y [the trial court] preventing . . . Turner from testifying," he was "denied the right to put on his defense." *See* U.S. CONST. amends. VI, XIV; TEX. CONST. art. I, § 10.

We review a trial court's decision to exclude evidence of mental illness for an abuse of discretion. *Jackson v. State*, 160 S.W.3d 568, 574–75 (Tex. Crim. App. 2005); *see also Nickerson v. State*, 478 S.W.3d 744, 757 (Tex. App.—Houston [1st Dist.] 2015, no pet.). We will not reverse the trial court's ruling unless it falls outside the zone of reasonable disagreement. *Resendiz v. State*, 112 S.W.3d 541, 544 (Tex. Crim. App. 2003); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990). If the trial court's ruling was correct on any theory of law applicable to the case, then we will uphold the judgment. *Ross*, 32 S.W.3d at 855–56; *Nickerson*, 478 S.W.3d at 757.

Appellant argues that because Dr. Turner's testimony about PTSD negates the required *mens rea* for the offense of murder, it was admissible under Texas Code of Criminal Procedure article 38.36(a) and *Ruffin v. State*, 270 S.W.3d 586 (Tex. Crim. App. 2008).

Generally, relevant evidence[5] that negates the *mens rea* element of an offense, including evidence of a defendant's history of mental illness, may be presented to a jury. *Jackson*, 160 S.W.3d at 574 (defendant convicted of offense of murder); *see also Lizcano v. State*, No. AP-75,879, 2010 WL 1817772, at *19 (Tex. Crim. App. May 5, 2010) (not designated for publication) (defendant convicted of offense of capital murder); *Quick v. State*, No. 01-09-01127-CR, 2011 WL 286155, at *4 (Tex. App.—Houston [1st Dist.] Jan. 27, 2011, no pet.) (mem. op., not designated for publication) (defendant convicted of offense of murder). And in a prosecution for murder, "the [S]tate or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing . . . together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.36(a); *see Jackson*, 160 S.W.3d at 574 (quoting article 38.36(a) in discussion of admissibility of mental-illness evidence in prosecution for murder).

---

[5]     *See* TEX. R. EVID. 401 (defining relevant evidence).

However, mental-illness evidence, including that which is admissible in a murder prosecution under 38.36(a), must still meet the general requirements for admission under the Texas Rules of Evidence,[6] and it may be excluded if it does not actually negate the required *mens rea* of the offense. *Mays v. State*, 318 S.W.3d 368, 381–82 (Tex. Crim. App. 2010) (trial court not required to admit expert testimony concerning defendant's mental illness during guilt stage of trial where "it d[oes] not directly rebut his culpable *mens rea*"); *Jackson*, 160 S.W.3d at 574–75 (trial court has discretion to exclude mental-illness evidence, including evidence admissible under article 38.36(a), which does not negate element of *mens rea*); *see also Lizcano*, 2010 WL 1817772, at *19 (mental-illness evidence must meet general applicable requirements for admission of evidence and "may be excluded if it does not truly negate the *mens rea*" for offense); *Ward v. State*, No. AP-75750, 2010 WL 454980, at *2 (Tex. Crim. App. Feb. 10, 2010) (not designated for publication); *Nikmanesh v. State*, No. 05-16-00363-CR, 2017 WL 2774445, at *3–4 (Tex. App.—Dallas June 27, 2017, no pet.) (mem. op., not designated for publication); *Brown v. State*, No. 04-12-00813-CR, 2014 WL 3747234, at *4–5 (Tex. App.—San Antonio July 30, 2014, no pet.) (mem. op., not designated for publication); *Quick*, 2011 WL 286155,

---

[6] *See, e.g.*, *id.* 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence.").

14

at *4–5 (mental-illness evidence, including that admissible under article 38.36(a), may be exclude where it does not truly negate requisite intent for offense of murder).

The *mens rea* for the offense of murder is intentionally or knowingly causing the death of an individual or intending to cause serious bodily injury and committing an act clearly dangerous to human life that causes the death of an individual. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (Vernon 2011); *see also id.* § 6.03(a), (b) (Vernon 2011) (defining when person acts intentionally, or with intent, and knowingly, or with knowledge); *Braughton v. State*, 522 S.W.3d 714, 727 (Tex. App.—Houston [1st Dist.] 2017, pet. granted). Thus, the excluded testimony in this case must negate the culpable mental state or show that appellant's mental illness prevented him from forming (a) the intent to cause the death of the complainant or (b) the intent to cause the complainant serious bodily injury where his act caused the death of the complainant. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2). In other words, appellant's mental-illness evidence must do more than provide an excuse or justification for appellant forming the requisite intent; it must show that appellant was prevented from forming the intent to commit the offense of murder. *See Mays*, 318 S.W.3d at 381 (mental-illness evidence did not rebut culpable mental element of either capital murder or murder; mental-illness evidence only showed *why* defendant intentionally and knowingly killed law enforcement officer); *see also Ward*, 2010 WL 454980, at *4 (forensic psychologist's testimony "presented only

15

an excuse for the crime: that [defendant] intentionally killed [the complainant] because he was so paranoid that he thought [the complainant] . . . was out to get him"); *Nikmanesh*, 2017 WL 2774445, at \*3–4 (expert testimony concerning defendant's "major depressive disorder or obsessive-compulsive personality disorder could only offer an explanation or motive for [his] actions but could not negate intent" for offense of murder).

Here, Dr. Turner, outside the presence of the jury, testified that he is a clinical psychologist who has experience with patients suffering from PTSD. In March 2016, he conducted a psychological evaluation of appellant. After his examination, Turner concluded that appellant was competent and sane at the time of the offense. However, Turner diagnosed appellant as having major depressive disorder, recurrent and severe PTSD, and severe alcohol use disorder that was in "full remission."

Dr. Turner explained that appellant's PTSD was "more on the severe end," although it was not "the most severe" that he had seen. It "stem[med] from his service in the United States Army in Vietnam between 1967 and 1971." Appellant had received "some treatment for [his] PTSD" and "disability through the United States government." And Turner opined that on November 5, 2013, appellant had PTSD.

In regard to PTSD generally, Dr. Turner noted that a person with PTSD could "re[-]experienc[e] . . . th[e] event [that caused the PTSD] through nightmares,

through intrusive memories, [and] sometimes flashbacks." A person with PTSD could also demonstrate "avoidant behavior," i.e., "going out of one's way to avoid situations, things, smells, sounds that remind [him] of th[e] event, a negative emotional state," "a flat affect," irritability, and "other negative emotional criteria." A "hallmark of PTSD" is also hypervigilance, i.e., a person is "very aware of [his] surroundings," "perceive[s] danger, oftentimes in places where someone without PTSD would not," and is "more apt to . . . see[] [certain behavior] as a threat." A person with PTSD could also react to a perceived threat at a quicker rate.

Related to appellant's PTSD, Dr. Turner opined generally that when appellant is placed "in a situation where he perceive[s] himself to be in danger," his "experience [of] fear and an increase in [his] nervous system activity" are "exacerbated greatly." And because appellant's PTSD is "of a military nature and [a] combat nature," his "response cycle is to defend himself," i.e., appellant is "more prone to stand and defend himself as opposed to getting away from the area." However, Turner clarified that appellant's PTSD did not "cause[] his actions" on November 5, 2013, and appellant was not experiencing a "break with reality" or a "delusional state" at the time of the offense. Further, appellant's PTSD did not cause "diminished capacity or . . . insanity."

Dr. Turner further noted that appellant, in regard to the night of November 5, 2013, had reported to him that he had felt threatened by the complainant. The

17

complainant had approached him, appeared to be "reaching for a weapon," and "verbalized a threat to kill [him]." Appellant then shot the complainant, who left the area. Appellant "contemplated following the [complainant] to see if he was okay or what had happened with him[,] but . . . he didn't know why the [complainant] was accosting him[,] . . . if the [complainant's] intention was to rob him[,] or if [the complainant] had friends hanging around." Accordingly, appellant decided not to follow the complainant "for his own safety." Appellant told Turner that "he didn't think [that] he had done anything wrong because he believed he had acted in self[-]defense." Turner noted that appellant's story had remained consistent "over time."

Notably, Dr. Turner's testimony does not address appellant's inability to form the intent to kill the complainant or his capacity to act with knowledge of his conduct and its consequences; rather, the testimony provides an explanation or excuse as to why appellant shot the complainant. *See Mays*, 318 S.W.3d at 381–82 ("All of [defendant]'s mental-illness evidence showed why he intentionally and knowingly killed" law enforcement officer; defendant's evidence did not "suggest that he did not intend to shoot a person."); *Quick*, 2011 WL 286155, at *4–5 (trial court did not err in excluding mental-illness evidence in murder case where evidence "fail[ed] to show that [defendant] did not act intentionally or knowingly"); *see also Lizcano*, 2010 WL 1817772, at *19–21 (trial court did not err in excluding testimony from

18

defense experts about defendant's "limitations in cognitive ability, intoxication at the time of the offense, and general [mental] deficits" where evidence did not negate *mens rea* element for capital murder and "no evidence show[ed] a connection between [defendant's] generally low level of mental functioning and his knowledge during the commission of the [capital murder] offense"); *Ward*, 2010 WL 454980, at *4 (trial court did not err in excluding forensic psychologist's report and testimony where evidence "presented only an excuse for the crime: that [defendant] intentionally killed [the complainant] because he was so paranoid that he thought [the complainant] . . . was out to get him"); *Nikmanesh*, 2017 WL 2774445, at *3–4 (trial court did not err in excluding "psychiatric evidence" where expert testimony concerning defendant's "major depressive disorder or obsessive-compulsive personality disorder could only offer an explanation or motive for [his] actions but could not negate intent" for offense of murder); *Palmer v. State*, No. 05-14-00671-CR, 2015 WL 6859783, at *3–4 (Tex. App.—Dallas Nov. 9, 2015, pet. ref'd) (mem. op., not designated for publication) (trial court did not err in excluding expert's testimony about defendant's history of mental issues and current stressors because evidence did not suggest defendant did not "form[] the intent to kill his in-laws, or any other person"); *Brown*, 2014 WL 3747234, at *3–5 (trial court did not err in excluding psychiatrist's testimony regarding mental illness where testimony did not negate *mens rea* for offense of murder; psychiatrist did not state

19

defendant incapable of forming intent to kill or incapable of acting with knowledge of her conduct and its consequences); *Smith v. State*, 314 S.W.3d 576, 589–91 (Tex. App.—Texarkana 2010, no pet.) (trial court did not err in excluding evidence of defendant's mental-health history where evidence did not show, "due to her mental condition, [defendant] was either unable to form a conscious objective or desire or to engage in conduct causing [the complainant's] death, or could not be aware [that] her actions were reasonably certain to cause [the complainant's] death").

In other words, the mental-illness evidence proffered by appellant in this case does not negate the requisite *mens rea* for the offense of murder. *Mays*, 318 S.W.3d at 380–82 (although mental-illness testimony "may be relevant for mitigation purposes during the punishment phase [of trial], . . . expert testimony that does not directly rebut the culpable mental state usually may be excluded at the guilt stage"); *Jackson*, 160 S.W.3d at 574–75 (trial court has discretion to exclude mental-illness evidence which does not negate element of *mens rea*); *see also Nikmanesh*, 2017 WL 2774445, at *3–4; *Quick*, 2011 WL 286155, at *4–5.

Further, we note that the trial court could have also excluded Dr. Turner's testimony, which did not relate to appellant's ability to form the requisite intent at the time he shot the complainant, as overly confusing or misleading to the jury. *See* TEX. R. EVID. 403 (relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues,

20

misleading the jury, undue delay, or needlessly presenting cumulative evidence"); *Jackson*, 160 S.W.3d at 574–75 (relevant mental-illness evidence admissible under article 38.36(a) "may [still] be excluded under Rule 403 if the probative value of the evidence 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence'" (quoting TEX. R. EVID. 403)); *see also Smith v. State*, No. 05-16-00102-CR, 2017 WL 462349, at *3 (Tex. App.—Dallas Feb. 1, 2017, pet. ref'd) (mem. op., not designated for publication) (trial court could have excluded evidence of defendant's mental illness where such evidence did "not relate[] to his ability to form the requisite intent at the time of the murder" and "could confuse or mislead the jury" (citing TEX. R. EVID. 403)); *Gassaway v. State*, No. 05-07-00922-CR, 2009 WL 1547756, at *3–5 (Tex. App.—Dallas June 4, 2009, pet. ref'd) (not designated for publication) (mental-illness evidence which did not negate *mens rea* for offense of murder could mislead jury on factual issues).

Accordingly, we hold that the trial court did not err in excluding Dr. Turner's testimony during the guilt phase of trial. *See Mays*, 318 S.W.3d at 381–82; *Jackson*, 160 S.W.3d at 574.

We overrule appellant's second issue.

21

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Massengale, and Caughey.

Do not publish. TEX. R. APP. P. 47.2(b).